# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| **In Re:** **PETER TYSON ROMAINE,** Debtor. | **Bankruptcy Case No. 10-40326-JDP** |
| **R. SAM HOPKINS,** Plaintiff, vs. **PETER TYSON ROMAINE,** Defendant. | **Adv. Proceeding No. 11-8055-JDP** |

## MEMORANDUM OF DECISION

Appearances:

R. Sam Hopkins, Pocatello, Idaho, Chapter 7 Trustee.

Aaron J. Tolson, TOLSON LAW OFFICES, Ammon, Idaho, Attorney for Defendant.

MEMORANDUM OF DECISION – 1

*Introduction*

In this adversary proceeding, chapter 7[1] trustee, R. Sam Hopkins ("Trustee") asks for a judgment revoking the discharge of debtor Peter Tyson Romaine ("Debtor"). After a trial on January 12, 2012, the issues were taken under advisement. The Court has considered the submissions of the parties, the testimony and evidence presented at trial, the arguments of counsel, as well as the applicable law. This Memorandum constitutes the Court's findings of fact and conclusions of law, and disposes of the issue raised in the adversary complaint. Fed. R. Bankr. P. 7052.

*Facts*

Debtor was the sole owner of a corporation, TBIS Irrigation and Water Management Co. ("TBIS")[2]. He had owned and worked for TBIS for

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 – 9037, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] TBIS is also referred to as "Teton Basin Irrigation Systems, LLC" in Debtor's decree of divorce. *See* Claims Register, Claim No. 4-1, Part 2, ¶ 28(e). The correct name of the business entity is immaterial to the issues before the Court.

MEMORANDUM OF DECISION – 2

seven years, during which time the company built up a list of steady customers. In 2007, Debtor and his wife divorced, and pursuant to the property settlement provisions contained within their divorce decree, she was to receive, *inter alia*, $200,000 payable on specified terms. Claims Register, Claim No. 4-1, Part 2, ¶ 28(e). This obligation was secured in part by the assets of TBIS. *Id*.

In addition to Debtor's ex-wife, other creditors of TBIS, particularly First Interstate Bank, held security interests in the personal property and equipment owned by the company; it is unclear whether the intangible assets were likewise encumbered.[3]

On March 9, 2010, Debtor filed a chapter 7 petition. On March 25, 2010, creditor First Interstate Bank filed a proof of claim in which it claimed an unsecured debt owed in the amount of $27,340.03, and a secured debt in the amount of $50,000. Claims Register, Claim No. 1-1. First Interstate's claim was amended on June 18, 2010 to increase the unsecured claim to $48,011.15, and to decrease the secured claim to

---

[3] The Court was not provided with copies of any security agreements.

MEMORANDUM OF DECISION – 3

$29,328.88.  Claims Register, Claim No. 1-2.  Debtor's ex-wife filed a proof of claim on June 21, 2010 in the amount of $113,198.

A little over a month after Debtor filed his bankruptcy petition, on April 12, 2010, Debtor executed a Purchase Agreement ("Contract") with MD Nursery and Landscaping ("MD").  Ex. 200.  The Contract was prepared by Debtor and the owner of MD without counsel.  Through the Contract, Debtor sold to MD, *inter alia*:  1) the "client and the client information list of Peter Romaine"; 2) the rights to two business phone numbers and the TBIS email address; 3) the key to a specific Post Office box [presumably belonging to TBIS]; 4) the contents of a storage container [which contained miscellaneous sprinkler parts, tools and shovels belonging to TBIS]; and 5) any additional customer leads or contracts obtained through December 31, 2010.  *Id*.  The parties listed in the Contract were MD as the buyer, and "Peter Romaine" as the seller.  TBIS is not mentioned in the document, except in the paragraph whereby Debtor agreed to retain any debt "whether it is personal or associated with TBIS Irrigation and Water Management Company."  *Id*. at ¶ H.  Debtor signed

MEMORANDUM OF DECISION – 4

the Contract as an individual; the line provided to allow him to designate his "title" was left blank.

The Contract provided that Debtor would be paid $5,000 at signing, and another $5,000 "upon completion of all spring start-ups that are obtained through purchase of the above referenced list. If buyer is unable to obtain contracts of at least twenty-five (25%) of purchased list the second payment becomes null and void." *Id*. A check for $5,000 was issued by MD the same day the Contract was signed; Debtor cashed that check two days later, on April 14, 2010. Ex. 100. He held onto the cash for a period of time, and did not forward it to Trustee, nor did he amend his schedules to include the payment.

Nine days after the Contract was executed, Debtor appeared at the § 341 meeting of creditors in his bankruptcy case. At trial, Debtor testified that he thought he mentioned the client list sale to MD to Trustee at the § 341 meeting, but that he believed the client list belonged to TBIS, and thus was of no concern to Trustee. Debtor still had the $5,000 in cash received pursuant to the Contract at the time of the § 341 creditors

MEMORANDUM OF DECISION – 5

meeting.

On June 8, 2010, Debtor deposited the $5,000 into the TBIS checking account. Ex. 202. That money was removed the same day, through the use of a check. *Id.* On June 9, Debtor deposited another $5,000 into the TBIS account, which deposit was reversed that same day. *Id.* Altogether, $10,000 was deposited and withdrawn in the account over the course of two days, leaving the beginning and ending balance the same. *Id.* Debtor testified that the $5,000 deposited on June 8 was from the sale of the client list under the Contract; the other $5,000 deposit was from TBIS accounts receivable that had been paid.[4]

Debtor then worked for much of the Summer of 2010 for MD, servicing the former TBIS clients in an attempt to see that twenty-five percent of them stayed with MD so that the remaining $5,000 would be paid under the terms of the Contract. Debtor also worked for MD as an employee, servicing MD's clients, for which he was paid an hourly wage.

---

[4] Trustee has not asked to recover the $5,000 from accounts receivable, and so the Court need not consider this sum any further.

MEMORANDUM OF DECISION – 6

He received checks for those wages.[5]  Ex. 100.

On August 10, 2010, MD paid Debtor the remaining $5,000 due under the terms of the Contract.  Ex. 100.  Debtor deposited the check in the TBIS account on August 12, 2010, and withdrew the full amount in two telephonic transactions on August 30, 2010.  Ex. 202.  It appears that $2,000 of the deposit was withdrawn and transferred to Debtor's bank account, and $3,000 was transferred to a second account belonging to Debtor.  Debtor provided no information regarding those two accounts.

Debtor testified at trial that the two $5,000 payments received from MD actually represented wages earned.  He testified that the first check was for wages earned prior to April, 2010, and the second check represented his wage from TBIS for work over the summer under the Contract.  However, he also testified that the two payments represented wages he earned during the seven years he spent building the company.

---

[5] Exhibit 100 includes three checks which Debtor claims were paid to him as wages:  the first is check number 388, dated May 19, 2010, in the amount of $826; the second is check number 5926, dated May 31, 2010, in the amount of $1,453.52; and the third is check number 395, dated June 14, 2010, in the amount of $226.40.  The three checks total $2,505.92.

MEMORANDUM OF DECISION – 7

Debtor testified that he spent the money received from MD on a variety of things, both personal and on behalf of TBIS. For example, he paid some of this money toward child support, but also paid some TBIS expenses, such as rent payments and a car payment, which apparently had always been paid by TBIS. Debtor has no documentation to show how he spent the money. Interestingly, the MD income was included in both his personal tax return, as well as that of TBIS. Exs. 101, 201. Debtor's personal Federal income tax return provides for "other income" from a "Client List Sale" at line 21 in the amount of $11,705. Ex. 101. It is unclear how Debtor arrived at that figure, as the amount paid under the Contract was clearly $10,000, and the wages paid to Debtor by MD total $2,505.92.

On July 7, 2010, Debtor's bankruptcy discharge was entered. BK Dkt. No. 28. On June 28, 2011, apparently after having made multiple unsuccessful demands on Debtor to turn over the $11,705 listed in his personal tax return, Trustee commenced this adversary proceeding seeking revocation of Debtor's discharge.

*Analysis and Disposition*

MEMORANDUM OF DECISION – 8

Although Trustee has not specified the particular subsection of § 727 under which he seeks to revoke Debtor's discharge, it appears that § 727(d)(2) is the most applicable. It provides:

> On request of the trustee . . . and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if—
> * * * * *
> (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee[.]

Under § 727(d)(2), Trustee must prove (1) that Debtor acquired property of the bankruptcy estate and (2) that he knowingly and fraudulently failed to report or deliver such property to Trustee. *Krommenhoek v. Covino (In re Covino)*, 99.4 IBCR 138, 139 (Bankr. D. Idaho 1999) (citing *Bowman v. Belt Valley Bank (In re Bowman)*, 173 B.R. 922, 925-26 (9th Cir. BAP 1994)). Trustee, as the plaintiff in this adversary proceeding, bears the burden of proof and must establish all elements by a preponderance of the evidence. Rule 4005; *In re Covino*, 99.4 IBCR at 139.

MEMORANDUM OF DECISION – 9

The statute invoked by Trustee to revoke Debtor's discharge must be construed liberally in favor of the Debtor, and strictly against Trustee, as the party objecting to discharge. *In re Covino*, 99.4 IBCR at 140 (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986)).

    1.  <u>Debtor's Acquisition of Estate Property</u>.

The first element which Trustee must prove is whether Debtor acquired or became entitled to acquire, property that is property of his bankruptcy estate. While defining "property of the estate" is a question of federal law, the nature and extent of a debtor's interest in property is determined by reference to state law. *Murrietta v. Fehrs (In re Fehrs)*, 08.3 IBCR 116, 122 (Bankr. D. Idaho 2008); *Foothill Capital Corp. v. Clare's Food Mkt., Inc. (In re Coupon Clearing Serv., Inc.)*, 113 F.3d 1091, 1099 (9th Cir. 1997). The focus under § 541(a)(1) is on the rights of the debtor as of the date of the petition for relief. *In re Fehrs*, 08.3 IBCR at 116.

In this case, there can be no doubt that the TBIS client list existed on petition day, and that Debtor, as the sole principal of that company, sold that list, as well as the contents of the TBIS storage container, pursuant to

MEMORANDUM OF DECISION – 10

the Contract. This transaction netted $10,000, which Debtor received, and which he did not in turn remit to either TBIS's creditors, or to Trustee for the benefit of his personal creditors. That much was clearly proven at trial.

It is a closer question, though, whether the Contract payments were property of Debtor's bankruptcy estate. While it is a close question, based on this record, the Court finds that the transaction represented by the Contract was actually between MD and Debtor acting in his individual capacity. Although Debtor testified that he intended to enter into the Contract on behalf of TBIS as its owner and president, the Contract is not so drafted. Instead, it specifically contemplates the sale of "the client information list of Peter Romaine, further known as the 'Seller.'" Thus, the Contract indicates that Debtor is not only the seller, but that the client list belongs to him personally.

In addition, when Debtor signed his name to this document, he left blank the signature space for insertion of his title as president and owner of TBIS. It is difficult to understand this omission if Debtor truly intended

MEMORANDUM OF DECISION – 11

to be acting solely as a corporate representative.

Moreover, the first payment under the Contract was made out to "Peter Romaine," while the second $5,000 check was made out to "Pete Romaine." And Debtor's personal income tax return represents that he received $11,705 in income for "Client List Sale."[6] On the other hand, there is no evidence in the record, save Debtor's testimony, that the Contract was between MD and TBIS, rather than Debtor in his individual capacity.

Debtor's conduct also supports the Court's conclusion that Debtor sold TBIS assets to MD in his individual capacity. When he received the first payment check under the Contract, he cashed it, and then, upon advice of his accountant and according to his own testimony, he ran the funds through TBIS's bank account in order to show the Internal Revenue Service that the money went through the corporate account. However, he immediately withdrew the money from the company account and utilized

---

[6] Debtor testified that the income from the Contract also showed up on TBIS's tax return; however, the business return shows only $15,109 for gross receipts or sales. Beyond Debtor's testimony, the Court was given no proof to show that the $10,000 paid under the Contract was part of those gross receipts or sales; it is wholly unclear how that figure was derived.

MEMORANDUM OF DECISION – 12

it for his own purposes. This action shows that Debtor never considered the money to belong to TBIS or its creditors, nor did he intend to use the money for business purposes. While Debtor testified that he used some of the money to wind up the business, the record lacks any evidence to support this assertion. The same is true for the second $5,000 payment, which Debtor testified that he used to pay personal expenses, including child support.

Because the client list existed prebankruptcy, and because Debtor sold it in his personal capacity, the proceeds he received from that transaction were property of his bankruptcy estate. Thus, Debtor sold, after bankruptcy, and without Trustee's permission, property belonging to his bankruptcy estate. Debtor then retained the sales proceeds for his own use, and did not remit them to Trustee for the benefit of his creditors.

Trustee has proven by a preponderance of the evidence that Debtor acquired property belonging to his bankruptcy estate during the pendency of the bankruptcy which he did not turn over to Trustee.      **2. Knowing and Fraudulent Failure to Report or Deliver Property**.

MEMORANDUM OF DECISION – 13

Trustee must demonstrate that Debtor's conduct was both knowing and fraudulent. This requires that Debtor acted with actual, subjective intent to defraud, and not merely constructive intent. *In re Covino*, 99.4 IBCR at 140. However, a "finding of fraudulent intent may be based on inferences drawn from a course of conduct, or inferred from all the surrounding circumstances or the debtor's 'whole pattern of conduct.'" *In re Covino*, 99.4 IBCR at 139 (quoting *In re Yonikus*, 974 F.2d 901, 905-06 (7th Cir. 1992) (citing *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753-54 (9th Cir. 1985))). Once Trustee establishes a prima facie case of fraudulent intent, Debtor must come forward with evidence to support his version of the events. *In re Covino*, 99.4 IBCR at 140.

In this case, Trustee has proven that Debtor, after filing for bankruptcy protection and while acting in his capacity as an individual, sold the TBIS client list and retained the proceeds for his own use. He neither reported the sale to Trustee, included it on his schedules, nor delivered the proceeds to Trustee. While Debtor testified that he thought he disclosed the client list sale to Trustee, the Court finds that testimony is

MEMORANDUM OF DECISION – 14

not credible.

For starters, Debtor was uncertain whether he informed Trustee about the sale. Second, had Debtor told Trustee about the sale, or about the $5,000 in his possession at the time of the § 341 meeting of creditors, the Court expects that Trustee would have acted on that information and immediately demanded turn over of the funds. It is more likely that Trustee first learned of the sale from his review of Debtor's income tax return. In other words, Trustee had to address the problem after both $5,000 checks had been cashed and spent.

The facts proven by Trustee, as well as Debtor's course of conduct and the circumstances presented, establish that Debtor knowingly sold an asset that existed prepetition, and knowingly and fraudulently kept the proceeds for himself without disclosing or turning them over to Trustee for the benefit of his creditors. At this point, the burden shifts to Debtor to explain his actions.

Debtor testified that he thought the client list belonged to TBIS, and therefore the sale of it was not Trustee's concern. However, the second

MEMORANDUM OF DECISION – 15

element of § 727(d)(2) does not require that Debtor know that the property at issue is property of the estate.  Rather, the statute requires only proof that Debtor knowingly and fraudulently failed to report or deliver the property.  *In re Yonikus*, 974 F.2d at 904-05.  Debtor clearly treated the proceeds as his own property, and he knowingly and fraudulently failed to both report and deliver the funds to Trustee for the benefit of his creditors.  As the Court has previously explained, "Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate."  *In re Covino*, 99.4 IBCR at 139 (quoting *In re Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992)).  Thus, Debtor had a duty to report the client list sale transaction to Trustee even if he believed that the list was TBIS property and not property of his bankruptcy estate, so that Trustee could take a position as to his right to the funds.  He did not do so.

Debtor also testified that he believed he had earned and was owed wages by TBIS, and that he considered the $10,000 he received was payment of those wages.  There is some factual support for this testimony.

MEMORANDUM OF DECISION – 16

In order to ensure that twenty-five percent of TBIS clients signed up for service with MD, thus entitling Debtor to the final $5,000 payment under the Contract, Debtor believed he had to personally contact those clients and complete their spring irrigation start ups, and generally ensure a smooth transition from TBIS to MD.  While the Contract does not specifically require such work of Debtor, his understanding of what was required of him is logical given the circumstances.  Furthermore, when he worked for MD's own clients from time to time, he was paid a wage by MD for that work.

      The difficulty with Debtor's belief concerning the payment of wages lies in the fact that the two $5,000 payments are derived from the sale of the client list, rather than wages paid in the regular course of TBIS business.  Indeed, TBIS was essentially defunct at the time Debtor sold the client list, or was rendering any services to MD.  Moreover, the first $5,000 check was paid on the date the Contract was signed, and thus clearly was not for any services performed by Debtor pursuant to the Contract.  At best, that initial payment would have been for services Debtor rendered to

MEMORANDUM OF DECISION – 17

TBIS prior to that date, most likely before the bankruptcy petition was filed. In other words, such a wage payment (if that is what it was) would have clearly been property of the bankruptcy estate.

Additionally, with regard to the first $5,000 payment, Debtor testified that he felt he had earned the wages by April, when the Contract was signed. The second check, he testified, represented wages paid for the work he did under the Contract. However, Debtor also testified that he decided to shutter TBIS on the day he signed the Contract. Finally, Debtor also testified that he earned both $5,000 checks as a wage for the past seven years as he built up the business. In short, it appears that not even Debtor is sure of what services the alleged wage payments were intended to compensate. No accounting was presented to show that Debtor was owed wages by TBIS, nor did Debtor demonstrate that the payments were, in fact, wages. Moreover, Debtor's personal income tax return indicates that the income is from a "Client list sale," and does not indicate the $10,000 was paid to him as wages.

In his defense, Debtor repeatedly asserted that he had neither an

MEMORANDUM OF DECISION – 18

attorney nor a bookkeeper by the time the Contract was signed and the sale proceeds paid to him. If this is intended as an excuse for Debtor's failure to disclose the payments to Trustee and turn over the funds, the Court gives it little credence. Once Trustee put forth prima facie evidence of a knowing and fraudulent failure to report or to deliver the acquisition of estate property, it was Debtor's burden to explain and prove that this was not his intent.

The Court is mindful that § 727 is construed liberally in favor of the debtor and strictly against the party objecting to discharge. *In re Adeeb*, 787 F.2d at 1342. Nevertheless, the Court concludes that Trustee has satisfied his burden in this case.[7]

### *Conclusion*

---

[7] The cases interpreting § 727(d)(2) also require that trustee discover the debtor's fraud after entry of discharge. *Ross v. Mitchell (In re Dietz)*, 914 F.2d 161, 163 (9th Cir. 1990). Here, the record is equivocal as to when Trustee discovered that Debtor received the $10,000. Moreover, Debtor did not challenge this point. The Court would also note that Debtors' discharge was entered between the time he received the first and second payments. All things considered, the Court finds Trustee did not learn of the $10,000 sales transaction until after discharge had been entered.

MEMORANDUM OF DECISION – 19

On this record, the Court concludes that Trustee has shown that Debtor acquired property of the estate, namely $10,000 in client list sale proceeds, and knowingly and fraudulently failed to report the acquisition of the funds, or to deliver them to Trustee. The elements of § 727(d)(2) having been met, revocation of Debtor's discharge is warranted. In addition, the bankruptcy estate is entitled to recover the $10,000 that Debtor misappropriated.

A separate judgment revoking Debtor's discharge, and awarding Trustee a $10,000 money judgment against Debtor, will be entered.

Dated: March 8, 2012

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge